**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 20-102** |
| **JOSEPH WASHBURN** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

Defendant Joseph Washburn stands before this Court for sentencing for his conviction for enticement of a minor to engage in criminal sexual activity, travel to engage in illicit sexual conduct, and manufacturing of child pornography, all arising from his months-long efforts to groom, manipulate, and sexually exploit a 14-year-old child, which culminated in the defendant sexually assaulting her on May 24, 2019.

His crimes are so egregious that his calculated sentencing Guidelines range call for life imprisonment. For the reasons set forth below and which the Government will present at the sentencing hearing, the Government submits that the most appropriate sentence in this case is at least 60 years' incarceration, followed by lifetime supervised release.

**I.     PROCEDURAL BACKGROUND**

On February 27, 2020, the defendant, Joseph Washburn, was charged in a seven-count Indictment with Count One, use of an interstate commerce facility to entice a minor to engage in sexual conduct, in violation of 18 U.S.C. § 2422(b); Count Two, travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b); Counts Three through Five, manufacture and attempted manufacture of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e); Count Six, transfer of obscene material to a minor, in violation of 18 U.S.C. § 1470; and Count Seven, possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and

1

(b)(1).   On March 18, 2021, the defendant pleaded guilty to Counts One through Five of the Indictment pursuant to a written plea agreement, which called for the defendant's appellate waiver in exchange for the government's agreement to move to dismiss Counts Six and Seven of the Indictment after sentencing.   No other agreement as to sentence was reached between the parties.

The defendant has been in custody since his arrest on February 28, 2020.   Sentencing is set for October 12, 2021 at 1:00 p.m.

## II.    FACTUAL BACKGROUND

### A.    Facts Giving Rise to the Indictment

In late 2018, the defendant, then 20 years' old, began communicating with the child victim, a 14-year-old girl, over the application, Discord[1] From the beginning of their communications, the defendant knew that the child victim was a minor.    For example, on November 20, 2018, the two exchanged the following messages:

|   |   |   |
|---|---|---|
| a. | Washburn: | Soooo.   In Pennsylvania, age of consent is 16.   Like at that age you can fuck anyone your age or older. |
| b. | Child: | Yea.   Ayyye 2 more years |
| c. | Washburn: | You're 14? |
| d. | Child: | Yup.   Next year 15. |
| e. | Washburn: | Hmmmm I will be done with my electrician apprenticeship when you're my age |

The defendant and the child victim communicated frequently over Discord and over Instagram.   For at least the next seven months, through May 2019, the defendant repeatedly requested and directed the child victim to take sexually explicit images or videos of herself and send them to him.   The child victim complied with his requests.   For example, on December 28, 2018, the defendant and the child victim had the following exchange (**Counts One and Three**):

---

[1] Discord is an application designed for video gaming communities, that specializes in text, image, video, and audio communication between users in a chat channel.

a.  Washburn:     Still waiting to see some more of your buns
* * *
b.  Washburn:     Spread them cheeks and go to work
* * *
c.  Washburn:     Maybe you can spread your cheeks and show me your
starfruit
* * *
d.  Child:          Ok honey bun.   I send it then. Its made be a little dark tho.
Oooof   [*the child victim transmits image of a female spreading her
butt cheeks to display her anus and genital area*]
* * *
e.  Washburn:     It is dark
f.  Child:          Yea
g.  Washburn:     But I like the view

On January 17, 2019, the defendant directed the child victim as follows (**Counts One and

Four**):

a.  Washburn:     im gonna do a round then sleep
b.  Child:          Okie dokie honey bun
c.  Washburn:     wanna send something to help
d.  Child:          Mmmmm what do you want to see
* * *
e.  Washburn:     Dildo in pussy?
* * *
f.  Child:          Ima send the pics one sec
g.  Washburn:     ok honey. You just gotta finish now that you inserted the
dildo?
h.  Child:          WHA.   I uh.   Mmm [*the child victim transmits image of female
bent over and displaying her genital area*]
i.  Child:          Ooooof.
j.  Washburn:     I don't see the dildo
k.  Child:          I didn't bring it up with me
l.  Washburn:     mm well that's a good view.   I plan to see it lots when I do
you doggy

Then, on February 10, 2019, the defendant asked for the following (**Counts One and Five**):

a.  Washburn:     You were going to bed two hours ago. Whatcha doin
b.  Child:          Listening to music and drinking hot chocolate
c.  Washburn:     Oh? I figured you might be getting ready to take pix or be taking
them now
d.  Child:          Yea I am thinking about what kind of pic to take

3

* * *

| | | |
|---|---|---|
| e. | Washburn: | Well whatever you want to send me I guess is fine |
| f. | Child: | Mm |
| g. | Child: | What do you want to see |
| h. | Washburn: | Your face and tits in one pic |
| i. | Child: | Mmmk |
| j. | Washburn: | Dildo in pussy |
| k. | Washburn: | You know the stuff I've mentioned wanting to see then haven't seen |
| l. | Child: | Mmmm |
| m. | Child: | I'm gonna go take the pic |
| n. | Washburn: | Ok |
| o. | Washburn: | Can I get many pix to make me feel better after all this stuff that's happened today? |
| p. | Child: | Mhm |
| a. | Washburn: | Mmm I'll list what I wanna see then |
| q. | Washburn: | I wanna see your booty standing up, you bent over, you spreading |
| r. | Washburn: | Your pussy normal, with dildo, then spread |
| s. | Washburn: | Your face with tits |
| t. | Washburn: | How hairy your under arms are |
| u. | Child: | Mmk |

* * *

| | | |
|---|---|---|
| v. | Washburn: | Oh you could show me you bent over with a dildo in you |
| w. | Child: | [*the child victim transmits two images of her sitting and spreading her legs to display her vagina*] |

Over the course of their many months of messaging, the defendant also transmitted sexually explicit images of himself to the child victim.   By March 2019, the defendant's requests for sexually explicit images and videos of the child victim became more frequent and intense, and he used threats and verbal abuse when she failed to comply as quickly as he demanded.   In one exchange on April 12, 2019, the defendant told the child victim that she must be "fucking retarded" when she failed to send the defendant her sexually explicit images that he was demanding fast enough.   By May 2019, the defendant's intimidation escalated, and he began threatening to expose this child's sexually explicit images and videos to others on the internet, and, more significantly, to her family and friends.   The defendant went so far as to contact a friend of the child victim's on Instagram and write, "She and I are gonna be together for a long time and if not

4

I've got a lot of stuff she's sent me to send to everyone she knows, mail physical copies to her family too."

Beginning in at least January 2019, the defendant discussed his plans to travel from his residence in Virginia to Philadelphia to have sex with the child victim  On May 24, 2019, the defendant followed through with his plans and traveled from his home in Midlothian, VA to Philadelphia via Greyhound Bus with a return ticket dated May 27, 2019.   The defendant messaged the child victim letting her know that he was "[o]n the bus," and had "a surprise when we meet if we find a place to stay."   Once he arrived, the defendant checked into the Hub Motel at 7605 Roosevelt Boulevard in Philadelphia.   The defendant met the child victim at a coffee shop and together, they returned to the defendant's hotel room.   There, the defendant, then 21 years' old, had sex with the still 14-year-old child victim (**Count Two**).   Shortly after, in response to the child victim's mother's concern that her daughter had not returned home after school, officers with the Philadelphia Police Department ("PPD") knocked on the door of the defendant's hotel room. When the defendant answered the door, he lied to police, reporting that the child victim was not there, denied ever interacting with her online, and claimed that he did not know her at all.   The officers persisted with their questions until eventually, the child victim poked her head out from under the covers and asked the officers to allow her to get dressed.   The officers then arrested the defendant.

The next day, officers with the PPD executed a search warrant of the defendant's hotel room and located, among other things, a registration card in the defendant's name, a Greyhound bus ticket in the defendant's name, and, most concerning, black zip ties, gray duct tape, two pocketknives, condoms, adult diapers, and petroleum jelly.

The defendant's Apple iPhone was also seized, and a search warrant obtained. A subsequent review revealed numerous conversations with the child victim and dozens of sexually explicit images and videos of her.

## III.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentences

As noted in the plea agreement, the Court may impose the following statutory maximum and mandatory minimum sentences: Count One, enticement of a minor to engage in sexual conduct, in violation of 18 U.S.C. § 2422(b), lifetime imprisonment, a ten year mandatory minimum term of imprisonment, a mandatory minimum five years of supervised release up to a lifetime of supervised release, a $250,000 fine, mandatory restitution of not less than $3,000 pursuant to 18 U.S.C. § 2259, forfeiture, a $100 special assessment, and, if found not to be indigent, an additional mandatory special assessment of $5,000 pursuant to 18 U.S.C. § 3014; Count Two, travel in interstate commerce to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b), 30 years' imprisonment, a mandatory minimum five years of supervised release up to lifetime of supervised release, a $250,000 fine, mandatory restitution of not less than $3,000 pursuant to 18 U.S.C. § 2259, forfeiture, a $100 special assessment, and, if found not to be indigent, an additional mandatory special assessment of $5,000 pursuant to 18 U.S.C. § 3014; on each of Counts Three through Five, manufacturing and attempted manufacture of child pornography, in violation of 18 U.S.C. § 2251(a), (e), 30 years' imprisonment, a 15 year mandatory minimum term of imprisonment, a mandatory minimum five years of supervised release up to lifetime of supervised release, a $250,000 fine, mandatory restitution of not less than $3,000 pursuant to 18 U.S.C. § 2259, forfeiture, a $100 special assessment, and, if found not to be indigent, an additional

mandatory special assessment of $5,000 pursuant to 18 U.S.C. § 3014, and pursuant to 18 U.S.C.

§ 2259A, an additional assessment of no more than $50,000.

The total maximum and mandatory minimum sentence is lifetime imprisonment, 15 years

mandatory minimum imprisonment, a mandatory minimum five years supervised release up to a

lifetime of supervised release, a $1,250,000 fine, mandatory restitution of a minimum of $3,000,

a $500 special assessment, and if found not to be indigent, an additional mandatory special

assessment of $25,000 under 18 U.S.C. § 3014, and an additional special assessment pursuant to

18 U.S.C. § 2559A of up to $150,000.

### B.    Sentencing Guidelines Range Calculation

The parties agree that the United States Probation Office properly calculated the

defendant's advisory Guideline range as life imprisonment[2]:

| Group | Count | Charge | Enhancements | Points | Total |
|---|---|---|---|---|---|
| **One** | One, Three | 18 U.S.C. § 2422(b); 18 U.S.C. § 2251(a) | Base offense level, USSG § 2G2.1 | 32 | |
| | | | Offense involved a minor over 12, but under 16, USSG § 2G2.1(b)(1)(B) | +2 | |
| | | | Offense involved distribution, USSG § 2G2.1(b)(3) | +2 | |
| | | | Offense involved the use of a computer, USSG § 2G2.1(b)(6)(B)(i) | +2 | |
| | | | | | 38 |
| **Two** | One, Four | 18 U.S.C. § 2422(b); 18 U.S.C. § 2251(a) | Base offense level, USSG § 2G2.1 | 32 | |
| | | | Offense involved a minor over 12, but under 16, USSG § 2G2.1(b)(1)(B) | +2 | |
| | | | Offense involved distribution, USSG § 2G2.1(b)(3) | +2 | |

---

2 Pursuant to U.S.S.G. § 5D1.2(b), lifetime supervised release is recommended for child sex offenders, which is exactly what the government seeks in this case.

| | | | Offense involved the use of a computer USSG § 2G2.1(b)(6)(B)(i) | +2 | |
|---|---|---|---|---|---|
| | | | | | 38 |
| **Three** | One, Five | 18 U.S.C. § 2422(b); 18 U.S.C. § 2251(a) | Base offense level, USSG § 2G2.1 | 32 | |
| | | | Offense involved a minor over 12, but under 16, USSG § 2G2.1(b)(1)(B) | +2 | |
| | | | Offense involved distribution, USSG § 2G2.1(b)(3) | +2 | |
| | | | Offense involved the use of a computer, USSG § 2G2.1(b)(6)(B)(i) | +2 | |
| | | | | | 38 |
| **Four** | Two | 18 U.S.C. § 2423 | Base offense level, USSG § 2G1.3(a)(4) | 24 | |
| | | | Offense involved unduly influencing a minor to engage in prohibited sexual conduct, USSG § 2G1.3(b)(2)(B) | +2 | |
| | | | Offense involved the use of a computer, USSG § 2G1.3(b)(3)(A) | +2 | |
| | | | Offense involved the commission of a sex act or sexual contact, USSG § 2G1.3(b)(4)(A) | +2 | |
| | | | | | 30 |
| | | | Highest offense level: | 38 | |
| | | | Multiple groups: | +4 | |
| | | | Pattern of activity of prohibited sexual conduct, § 4B1.5(b)(1) | +5 | |
| | | | **Total offense level:** | **47** | |
| | | | Considering acceptance of responsibility: | -3 | |
| | | | **Adjusted offense level** | **44** | |

With the defendant's criminal history category of I, his Guideline range is life imprisonment.

8

## IV.    ANALYSIS OF STATUTORY FACTORS

At sentencing, district courts follow a three-step process.    First, the court must calculate the Sentencing Guidelines range applicable to the defendant.    Second, in doing so, the court must formally rule on both parties' motions and state on the record whether the court is granting a departure and, if so, how the departure affects the Sentencing Guidelines calculation.    Finally, the court must exercise its discretion by considering the relevant factors enumerated in 18 U.S.C. § 3553(a) in setting the sentence it imposes, whether or not the sentence varies from the range calculated under the Sentencing Guidelines.    *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

The sentencing considerations set forth in Section 3553(a) that the Court must consider at the third stage of sentencing include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the Guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.    18 U.S.C. § 3553(a).    These factors are discussed below.

### A.    The Nature and Circumstances of the Offenses

Child sexual exploitation crimes are undisputedly grave offenses, and this case is a prime

example of how these types of crimes wreak havoc on the mental and physical health of its victims. The defendant, who was 20 and then 21 years' old during the relevant time period of the Indictment, preyed upon, groomed, manipulated, threatened, and then raped the then 14-year-old child victim in this case. The defendant knew almost immediately after he started messaging with the child victim that she was only 14 years' old and a minor. PSR ¶ 24. Any suggestion by the defendant to the contrary[3] is completely refuted by the defendant's message history over Discord with the child victim:

*November 12, 2018*

|   |   |   |
|---|---|---|
| a. | Washburn: | Soooo.   In Pennsylvania, age of consent is 16.   Like at that age you can fuck anyone your age or older. |
| b. | Child: | Yea.   Ayyye 2 more years |
| c. | Washburn: | ***You're 14?*** |
| d. | Child: | ***Yup.   Next year 15.*** |

The defendant knew more than just Pennsylvania's age of consent. He was aware that it was illegal for him to have sex with the child victim given that he was 20 and then 21 years' old, and she was just a young teenaged girl:

*January 20, 2019*

|   |   |   |
|---|---|---|
| a. | Washburn: | Would you be ok not doing any pda when we meet?   Saving it all for the room? . . . . |
| b. | Child: | I'd be fine with that |
| c. | Washburn: | ***Ok because that tea place probably knows you're a schoolgirl . . . It's just a risk***. |

USAO-0345.

---

3 When defense expert Dr. Atkins asked the defendant if he knew the child victim's age, he replied, "Discord is specifically for adults; so, I assumed she was at least 18. I was 19 at the time. It wasn't until later that she told me her age. But I didn't really believe her; I thought she was pretending to be younger." Atkins Rpt. at 4. In addition to the fact that the defendant agreed with the government's factual basis for the charged offenses during the guilty plea hearing before this Court on March 18, 2021, which included his knowledge that the child victim was a minor for the duration of the time they messaged online, the messages above reflect that the defendant knew that the child victim was 14, a minor, and that it was problematic for him to be seen in public with her as her "boyfriend."

*March 6, 2019*

  a. Washburn:  I gotta spend some time this weekend getting ready for end of March . . . .   Booking a room, getting a bus pass . . . .  ***I'm just thinking, a lot, about a lot of different stuff. . . . .   How you're young and all the complications.***

USAO-0347.

  Though he knew the victim was just a young child, it did not stop the defendant from launching a near non-stop effort to groom and manipulate her,[4] before his behavior escalated from first, encouraging her to send sexually explicit images and videos:

*December 28, 2018*

  a. Washburn:  Still waiting to see some more of your buns . . . Spread them cheeks and go to work . . . Maybe you can spread your cheeks and show me your starfruit

PSR ¶ 25.

*January 17, 2019*

  a. Washburn:  im gonna do a round then sleep . . . .   wanna send something to help

PSR ¶ 26.

  Then, guilt-tripping her into sending sexually explicit images and videos:

*February 10, 2019*

  a. Washburn:  You were going to bed two hours ago.   Whatcha doin
  b. Child:    Listening to music and drinking hot chocolate
  c. Washburn:  Oh? I figured you might be getting ready to take pix or be taking them now
            * * *
  d. Child:    Mmmm . . . I'm gonna go take the pic
  e. Washburn:  Ok . . . Can I get many pix to make me feel better after all this stuff

---

4 "Grooming" includes manipulative behaviors that an abuser uses to gain access to a potential victim, coerce them to agree to the abuse, and reduce the risk of being caught.   Rape, Abuse & Incest National Network ("RAINN"), *Grooming: Know the Warning Signs*, available at https://www.rainn.org/news/grooming-know-warning-signs, last accessed Sept. 30, 2021.

that's happened today?

PSR ¶ 27.

Eventually, the defendant repeatedly hurled insults, verbal abuse, and threats upon this child:

*April 12, 2019*

|     |           |                                                                                                       |
| --- | --------- | ----------------------------------------------------------------------------------------------------- |
| a.  | Washburn: | Pix and vids   You don't listen anyways . . . .   You should've been sending stuff daily               |
| b.  | Child:    | I will listen I will I promise                                                                         |
| c.  | Washburn: | I told you I shouldn't have to ask if you wanted to send them. You want to send them right?            |
| d.  | Child:    | Yes yes I do                                                                                           |
| e.  | Washburn: | Or are you a liar                                                                                      |
| f.  | Child:    | I do want to send you pics                                                                             |
| g.  | Washburn: | Because if you lie to me I could never trust you and then I could never even talk to you               |

\* \* \*

|     |           |                                                                                                                                      |
| --- | --------- | ------------------------------------------------------------------------------------------------------------------------------------ |
| h.  | Child:    | Gimme a minute please I'm gonna send it I'm [sic] gotta get my sister out of the room I got.   I'm take three [more].   The two I have are sending.   I gotta take more |
| i.  | Washburn: | You must be fucking retarded.                                                                                                         |

USAO-0342.

*May 2, 2019*

|     |           |                                                                                                                                   |
| --- | --------- | --------------------------------------------------------------------------------------------------------------------------------- |
| a.  | Child:    | I found the videos                                                                                                                 |
| b.  | Washburn: | And I'm still waiting.   You were a complete fucking bitch on discord                                                              |
| c.  | Child:    | I'm actually sorry about that I didn't mean it to be honest also I was looking for some girls for you yesterday                     |
| d.  | Washburn: | Still waiting                                                                                                                      |
| e.  | Child:    | Can I please make a new one please I beg of you.   Please master I will get on all fours [and] beg for you please . . . .           |
| f.  | Washburn: | You just said you have the vids from last night.   Send em, redo em if you want or have to but I want the originals now.            |

USAO-0338.

*May 3, 2019*

    a.  Child:           Hey I just got home.   How was your day
    b.  Washburn:    I'm waiting on videos.   Then maybe we can from there.   Zzzz. I got injured at work.
    c.  Child:           How?
    d.  Washburn:    Hurry up with the video.   Or film your little sis shitting and you licking her butt clean eating her pussy out then eating her shit after playing with it and rubbing it on your face and tits . . . .   Anyways I'm headed to bed.   Send the videos when you want to try and make things better.

USAO-0343.

       This adult defendant's psychological hold on his child victim is apparent in the above messages.   The defendant controlled the type of sexually explicit photos and videos the child victim created to send to the defendant,[5] as well as who the child victim spoke to and even who she played video games with.   If the victim ever disagreed with anything the defendant directed her to do, the defendant berated her, and threatened to release her sexually explicit images and videos she shared with the defendant to her friends, family, and classmates.   In a conversation with the child victim's then 15-year-old friend, ▮▮▮, the defendant explained what he was prepared to do if the child victim stopped talking to him again:

*Date Unknown (Provided to Law Enforcement as Screenshots by ▮▮▮ )*

    a.  ▮▮▮:         Why you randomly hit me up tho
    b.  Washburn:    Because [the victim] and I were in a fight so I was gonna send everyone that knows her screenshots of the conversations she and I have had.   Some other stuff she's sent me too.   But she's talking to me again so for now i just have em all ready to send
    c.  ▮▮▮:         What stuff are you talking about

---

5 Though not the basis for a charge in the Indictment, on April 20, 2019, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PSR ¶ 36; USAO-0337.   This reflects the depths of the defendant's depravity, his utter disregard for the impact that such a request and act would have on the child victim, and the breadth of his control over her.

d.   Washburn:        Weird stuff she said she wants to do with me

* * *

e.   █████:            I want proof
f.   Washburn:        You'll get it if [the victim] messes things up again . . . .   You and just about every high schooler in philly . . . .   Will get the screenshots of posts she's sent me.   Among other things. . . . .

The defendant then went back and deleted (or attempted to delete) the above conversation with

███.   In the rest of the exchange, the defendant advised ███ that the child victim "isn't supposed

to be talking with any guys."

a.   █████:            Wait why did you just delete
b.   Washburn:        So you can't screenshot or show [the victim] what I said
c.   █████:            Me and her don't really talk that much
d.   Washburn:        That's good.   She isn't supposed to talk to you at all tho . . . .   [The victim] isn't supposed to be talking with any guys
e.   █████:            O Were you guys dating
f.   Washburn:        We still are . . . .   She and I are gonna be together for a long time and if not I've got a lot of stuff she's sent me to send to everyone she knows, mail physical copies to her family too.

USAO-0074-0084.

Just ten or so days before the defendant traveled from Virginia to Pennsylvania to have sex

with the child victim, on May 14, 2019, the defendant chatted with another of the child victim's

minor friends over Instagram.   In response to the defendant's ranting about the child victim and

his statement, "I won't embarrass her if she didn't lie to me . . . .   She did lie to me if she didn't

actually love me.   If she and I aren't together . . . She said she is only loyal to me and forever,"

the child victim's friend replied, "OMFG SHE DOESN'T LOVE YOU KAPPA [the defendant's

username]."   The defendant then threatened, "She'd better start then . . . .   Otherwise I have no

choice but to release the stuff she's sent."   USAO-0334.

This 14-year-old child felt scared, alone, ashamed, and powerless against the defendant.

In her forensic interview following the defendant's arrest on May 24, 2019, she reported that she

had tried blocking the defendant on Discord, but he would just make one new account after another and fill her inbox with messages.   PSR ¶ 34.   When she tried to ignore him, the defendant threatened to expose the photos and images she had shared with the defendant, which is consistent with the defendant's conversation with ▆▆▆ in which the defendant said that because he and the child victim were speaking, he would not release photos and videos to friends and family.   *Id.* Though the child victim thought about calling the police, she told the forensic examiner that she was too scared to do so.   USAO-0072.

It is hardly a surprise then that she agreed, under threat that the defendant would expose her most vulnerable moments to her friends, family, and classmates, to meet with the defendant on May 24, 2019.[6]   On that day, the child victim met with the defendant and went with him to the Hub Motel, where, in room 113, the defendant sexually assaulted her.   PSR ¶ 34.   The victim was terrified when she observed all of the items that the defendant had carefully packed and brought with him from Virginia: black zip ties, gray duct tape, two pocketknives, condoms, adult diapers, and petroleum jelly, among other things.[7]   PSR ¶ 33.

The impact on the child victim and her family has been enormous.   Immediately, she had to submit to a forensic interview, a rape kit, and disclose what she had been submitted to over the past several months by the defendant.   As noted by the forensic examiner, "[the victim] was feeling a lot of shame and guilt regarding the incident with [the defendant]. . . .   [The victim] cried

---

6 To the extent that the child victim and the defendant discussed meeting in Philadelphia before May 2019, it was the defendant and not the child victim who pressed the matter.   For example, on February 26, 2019, the child victim asked the defendant if they were still planning to meet in March.   When the defendant replied yes, she responded, "I'd be fine if you wanted to wait."   USAO-0346.

7 On the "Notes" app on the defendant's iPhone, he drafted a more extensive "Grocery list for vacation to Pennsylvania," including: "coconut oil tub; duct tape; towels, 2-4 small, 2 normal; cleaning supplies; 3 days of outfits; pull-ups; bananas; whipped cream; tie wraps; cuffs; collar; rings; Chapstick.   Potential buylist: open mouth gag; tail butt plug; morning after pill(s)."

throughout her interview." USAO-0072. The child victim had the immediate support of her mother, but initially, her father was "angry and blamed [the victim] for her actions." USAO-0072. This happened when the child victim was only 14 years' old. At a time of "significant biological, physiological, cognitive and social change in the human lifespan which often contributes to the emotional, social and moral development of the individual." Okunlola, O., et al., *Outcomes of sexual abuse on self-esteem among adolescents: A systematic review*, Cogent Social Sciences, Vol. 7, 2021 – Issue 1, available at, https://www.tandfonline.com/doi/full/10.1080/23311886.2020.1856296, last accessed Sept. 30, 2021. The impact of sexual abuse on a young teenager like the child victim here is wide-ranging, from low self-esteem, to depression, to self-blame, among other things. *Id.* In the child victim's own words, the defendant's actions have impacted her as follows:





Victim Impact Statement, attached as Exhibit A.

The defendant relentlessly exploited and assaulted the child victim for his own pleasure, and through his months' long hold on the child victim, he took her innocence, her feeling of self-worth, and her ability to trust others and herself.   Considering the heinous nature of the offense here, the defendant is deserving of a sentence of 60 years or more, as recommended by the Government here.

**B.      The History and Characteristics of the Defendant**

The defendant's history and characteristics also justify a sentence of at least 60 years imprisonment followed by lifetime supervised release.

**1.      Defense expert Dr. Atkins**

Defense counsel will likely frame the defendant as a passive, bullied, and victimized young man who—only after being charged in the instant case—was diagnosed, by the defendant's expert, with Autism Spectrum Disorder ("ASD") (notably, without identifying which level).    The defense expert report should be disregarded for three reasons: (1) Dr. Atkins conducted his evaluation *over the phone*; (2) Dr. Atkins did not review all of the discovery in this case, which is especially evident given the conclusions he has drawn; and (3) Dr. Atkins' diagnosis of ASD is unsupported by his own report.

**a.      Dr. Atkins failed to observe the defendant in person**

First, as Dr. Atkins himself acknowledges, the DSM 5 lists as the first criteria for ASD, "Persistent deficits in social communication and social interaction across multiple contexts," including "abnormal social approach and/or failure of back-and-forth conversation, and "deficits in nonverbal communicative behaviors used for social interaction," among other things.    Atkins Rpt. at 8.    Dr. Atkins formed his opinion based on an extremely limited interaction with the defendant *over the telephone* while the defendant was incarcerated at the Federal Detention Center. *See* Atkins Rpt. at 1 n.1.    In fact, nowhere does Dr. Atkins remark that the defendant struggled *at all* in his interactions with Dr. Atkins.    Rather, Dr. Atkins observed that the defendant appeared highly intelligent and well-oriented.

**b.      Dr. Atkins failed to review the discovery in this case**

Second, Dr. Atkins' report is almost completely devoid of any summary of the defendant's actions in this case, and his characterization of the defendant's conduct is offensive: "Joseph has been charged with various offenses including his communicating with a minor via the Internet and requesting naked images of her."    *See* Atkins Rpt. at 9.    In preparing his report, Dr. Atkins did not reach out to counsel for the Government or the lead case agent, revise his report or respond to information contained in the Presentence Report or Dr. Gonzalez's report, review the defendant's "off-the-record" communications, i.e., recorded calls and emails while the defendant was in custody, or, as discussed below, apparently any other evidence in this case.    It goes without saying that for Dr. Atkins to properly evaluate the defendant, he must understand the scope of the defendant's conduct in order to, at the very least, know if the defendant lied to him about his actions leading to the Indictment.    The report is riddled with minimizations and outright lies by

the defendant to Dr. Atkins that go unacknowledged and unquestioned by the defense expert.    As noted above, the defendant claimed ignorance of the child victim's age and said that even once the child victim told him she was 14, "I didn't really believe her; I thought she was pretending to be younger."    *See* Atkins Rpt. at 4.    The defendant's communications with the child victim contradict that claim.    The defendant told Dr. Atkins that they were boyfriend and girlfriend and that, "[a] couple of times, she told me that she would kill herself if she ever lost me."    *Id.*    In reality, it was the defendant who threatened to self-harm if the child victim did not produce sexually explicit videos fast enough:

*May 3, 2019*

|   |   |   |
|---|---|---|
| a. | Washburn: | Do you know what you're supposed to be doing and what you're not supposed to be doing?   And I mean 11 slices into my forearm and more.   I can't count the scars on my bicep. |
| b. | Child: | Jesus that's gotta hurt |
| c. | Washburn: | Not really.   You know what does hurt?   You failing this test and still to this point not knowing what you're supposed to be doing.   You have until 11.   Why do I see typing? |
| d. | Child: | I'm supposed to be taking pictures for you and doing videos and I should always be saying good morning to you every day and I should not talk back and should be doing pictures everyday no matter what. |
| e. | Washburn: | 12 minutes still waiting . . . .   I don't care how they get there but you had until 11 to get me the vids. |

PSR ¶ 40.[8]

The defendant also completely minimized his role in coercing the child victim to produce sexually explicit images and videos.    The defendant told Dr. Atkins that the child victim initiated

---

[8] This was not the first time that the defendant threatened self-harm to manipulate a "girlfriend."   In 2017, the defendant was psychiatrically admitted to a local hospital after he photographed himself aiming a firearm at his head and shared the photograph with a friend of his ex-girlfriend.   As explained to Dr. Gonzalez during the course of his evaluation at the Metropolitan Detention Center-Los Angeles, the defendant did this to get his ex-girlfriend's attention.   Gonzalez Rpt. at 6.

the sexual discussion by posting sexual pictures of cartoons, and that thereafter, "we exchanged naked pictures of ourselves."    Atkins Rpt. at 4.    Had Dr. Atkins reviewed a single conversation between the defendant and the child victim, he would know that the two did not simply exchange naked pictures.    Rather, the defendant directed the child victim on exactly what to perform in the images and videos he pressured her to send, withheld affection and kindness in the event she disappointed him, and required her to send him images and videos on-demand.    Dr. Atkins' erroneous and baseless conclusion that the defendant did not "attempt[] to groom, seduce, or entice [the child victim]," that "sexual components" were not what drove his communications, and that he was "not interested in her because she was so young" are groundless characterizations, completely inconsistent with the evidence in this case, and degrading to the victim of the defendant's crimes.    Atkins Rpt. at 10-11.

### c.    Dr. Atkins' ASD diagnosis is unsupported

Finally, Dr. Atkins' conclusion that the defendant suffers from ASD is wholly unsupported by Dr. Atkins' report.    Aside from deficits in social communication, which is addressed above, the DSM 5 also requires findings of restricted, repetitive patterns of behavior, interests, or activities, none of which are identified in Dr. Atkins' report, except for the defendant's mother and sister commenting on his love of video games.[9]    The DSM 5 also requires that symptoms be present in the early developmental period.    Dr. Atkins does not present any evidence from the defendant's medical or educational history (which he states he reviewed) from which he could conclude that the defendant has suffered from symptoms of ASD since early childhood.    Finally,

---

9 Dr. Atkins failed to do the most basic of investigation regarding the defendant's video game playing or question the defendant at all about any aspect of his game playing. If he had, *as Dr. Gonzalez did*, he would have learned that the defendant engaged in group-based games, which required "coordination, strategizing, and collaborating with strangers to achieve a common goal / objective."    Gonzalez Rpt. at 18.

Dr. Atkins cites only one example of the defendant suffering from "clinically significant impairment in social, occupational, or other important areas of functioning."  Atkins Rpt. at 8.  That is, "evidence" from the defendant's mother and sister that the defendant is "shy," "childlike," and "less socially and emotionally mature than his younger siblings."  Atkins Rpt. at 3.  Dr. Atkins did not bother to corroborate the defendant's family's account of his behavior through school, medical, or psychiatric records.  Had Dr. Atkins probed further, perhaps he would have learned, as the defendant disclosed to the probation officer, that he has had four dating relationships with women his same age.  PSR ¶ 110.  With respect to "clinically significant impairment" in "occupational, or other important areas of functioning," Dr. Atkins' report paints the opposite picture.  The defendant was in a gifted student program until eighth grade and graduated from high school in 2016.  Atkins Rpt. at 1.  The defendant worked as a server in a retirement home – a position which, according to the defendant, required taking orders, bringing food out, and washing dishes.  *Id.* at 2; PSR ¶ 129.  Thereafter, he spent one year tutoring other students in math courses, and otherwise, had logged nearly 2,500 work hours as a construction wireman.  PSR ¶ 125.  There is no indication that the defendant experienced significant impairment or any impairment at all in school, while working, or while pursuing romantic relationships.

Moreover, had Dr. Atkins reviewed the discovery provided to him by defense counsel, perhaps he would have considered the fact that the defendant lied to his own evaluator about his conduct in this case and his knowledge of the child victim's age in considering whether the defendant suffers from a developmental disability, which is characterized in part by difficulty in telling and maintaining lies.  *See* Li, A., *Exploring the Ability to Deceive in Children with Autism Spectrum Disorders*, J Autism Dev Disord. 2011 Feb; 41(2), available at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3482107/, last accessed Oct. 4, 2021.

In short, there is simply no credible evidence that the defendant actually suffers from ASD. Dr. Atkins' thin opinion, his biased and skewed reasoning[10] which relied almost exclusively on the defendant's self-reported behavior,[11] along with the information provided by the defendant's close family members, should be given little weight, if any.[12]

### 2.     Report prepared by Dr. Gonzalez at the Court's request

In stark contrast, the neutral third-party opinion delivered by the Bureau of Prison's Dr. Ernie Gonzalez at this Court's request is the only reliable opinion offered in this case.   In preparing his report, Dr. Gonzalez spent *more than two months* observing the defendant, he spoke

---

[10] For example, Dr. Atkins concluded as to an examination he "administered" to the defendant during one of his telephone conversations, that the "MCMI-IV results are consistent with ASD."   Dr. Atkins of course failed to detail how the results are consistent with ASD, thereby avoiding any analysis of his diagnosis or opinion.   Atkins Rpt. at 5.   Rather, Dr. Atkins copied and pasted block quotes from an outside party's interpretation of the defendant's profile – from a person who did not even have the limited contact of a phone interview with the defendant – but nonetheless concluded that the defendant suffered from low self-esteem, lack of initiative, and "depressive blandness."

[11] One of the three "examinations" (again, conducted over the telephone) that Dr. Atkins performed on the defendant included the Ritvo Autism Asperger Diagnostic Scale-Revised ("RAADS-R") – a *self-report* questionnaire.   In keeping with the same lack of information contained throughout his report, Dr. Atkins did not include the defendant's score on the questionnaire, but rather made the sweeping conclusion that the "RAADS-R results are also consistent with ASD."   Atkins Rpt. at 7.

[12] Even if the defendant did have ASD, that too should bear little weight on the Court's sentencing determination. There is no question that the defendant knew right from wrong.   The defendant knew what the age of consent was in Pennsylvania, which he remarked to the child victim when he first asked for her age.   He was weary of appearing in public with her and showing public displays of affection, given that she was obviously a "schoolgirl." The defendant deleted certain conversations with the child victim and with the child victim's friend ██   FBI Special Agent Daron Schreier observed after reviewing messages between the child victim and the defendant on Instagram that "throughout the thread [which spanned from September 2018 through May 2019], [the defendant's] sent messages have been deleted.   This is based on the context of [the child victim's] messages and their apparent responses to messages that are not present in the results [Instagram] provided."   USAO-0333.   ██ also told law enforcement when he was interviewed that after the defendant was released on bail after his arrest in Philadelphia, the defendant contacted ██ on Discord.   When ██ asked why the defendant was in jail, the defendant did not reply and subsequently deleted their text message history off of the Discord application.   USAO-0059.   The defendant ordered the child victim to count to 100 before coming up to the hotel room at the Hub motel, presumably to avoid the appearance that they were going to the room together, and then lied to police about knowing the child victim when he was first confronted by PPD officers.   PSR ¶ 34.

with defense counsel and counsel for the Government, conducted clinical interviews with the defendant, observed and monitored the defendant's behavior at the facility, reviewed all discovery in the case, administered five different tests and examinations, reviewed the defendant's medical records, and reviewed the defendant's telephone calls between April 1 and June 16, 2021 – the study period.   Gonzalez Rpt. at 1-2.

Dr. Gonzalez rejected a diagnosis of ASD.   He highlighted that those with ASD have pervasive and sustained impairments in communication and social interaction, and that "[d]iagnoses are most valid and reliable when these deficits are confirmed based on multiple sources of information, including clinician's observations, caregiver history, and, when possible, self-report."   Gonzalez Rpt. at 16.   Dr. Gonzalez concluded, after interacting with the defendant for months and reviewing phone calls and email communications from the defendant during his time in custody, that: (1) the defendant "did not evince any language deficits . . . . [or] marked impairments in communications"; (2) the defendant "evinced an ability to express frustrations via telephone conversations and appropriately respond to recipients of telephonic conversation"; and (3) the defendant "did not evince any difficulties interacting with other inmates and staff at MDC-LA."   *Id.* at 17.

Significantly, Dr. Gonzalez observed the defendant's ability to manipulate while at the Medical Center.   That is, that the defendant exhibited "some ingenuity and savvy in his efforts to circumvent institution policies."   Gonzalez Rpt. at 22.   Specifically, Dr. Gonzalez recounted that on June 3, 2021, the defendant left a note in a common area of the Psychology Department, which was regularly accessed by female inmates.   *Id.* at 12.   The note, which had the name "Joe" and a heart-shaped drawing on top, included the following information inside:

> Joe: 6ft1 205lbs Blond hair: Green eyes Glasses (came in today) Single White 23 Years Old forward mail to: 5502 Highberry Woods Road, Midlothian, VA (Virginia) 23112 Include Name & Reg # for reply Business Minded/oriented Hm me Up QT

Gonzalez Rpt. at 12.   When asked about the note, the defendant admitted that he had strategically placed it within the Psychology Department, as he was seeking out a "romantic relationship" with another female inmate at MDC-LA.   *Id.*   Though Dr. Gonzalez reminded the defendant of the prohibition against inmate relationships, the defendant pushed back and "seemingly began to challenge the information presented by [Dr. Gonzalez]."   *Id.*   Dr. Gonzalez also remarked on the following conduct: (1) that the defendant asked Dr. Gonzalez about his diagnostic conclusions and referred Dr. Gonzalez to Dr. Atkins' report; (2) he avoided disclosing his own offense history to other inmates so as to maintain his social standing; and (3) asked his family members to look up the criminal history of several inmates on his housing unit.   *Id.* at 12, 22.

Given the above, and Dr. Gonzalez's review as a whole, Dr. Gonzalez concluded that "there is no evidence to suggest Mr. Washburn has a mental disorder for which he would need treatment at a suitable facility."   *Id.* at 21.   To the extent that the defendant requires treatment to address his mental health issues, including "other specified trauma- and stressor related disorder"[13] and enuresis, Dr. Gonzalez concluded, given that the defendant appeared "mentally stable during the time period of the current evaluation," that "existing mental health concerns could be treated at any of the regular BOP correctional institutions . . . ."   *Id.* at 16, 22.

Setting aside the non-issue of the defendant's alleged ASD, the defendant presents as a fully functioning adult who knew right from wrong and who preyed on a 14-year-old girl's trust

---

13  This diagnosis was based on the defendant's disclosure that his maternal grandfather had molested him twice when he was five or six years old.   It is worth noting that the defendant made no mention of these incidents to Dr. Atkins.

and innocence for his own pleasure and desire for power and control. What Dr. Gonzalez characterized as "ingenuity and savvy" also reflects the defendant's manipulative nature and cunning. The defendant is dangerous, without empathy, and a threat to young girls. For these reasons, a sentence of at least 60 years is warranted and necessary to protect the public from the defendant.

### C.    The Seriousness of the Offense, Respect for the Law, and Just Punishment

A significant term of imprisonment is required here to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The defendant's crimes are among the most serious. And his choice of victim – a 14-year-old girl who trusted him – elevates the seriousness of his offenses. The sentence in this case must promote respect for the laws that the defendant has broken over and over again, with each message enticing the child victim to manufacture child pornography. This can only be done by the imposition of a significant sentence of incarceration. A sentence of at least 60 years has been well earned and is necessary to protect young girls who cannot protect themselves. Lifetime supervision is also necessary to monitor this very dangerous and manipulative child sex offender.

### D.    Deterrence

Deterrence is also one of the factors driving the sentence in this case. The defendant needs to be deterred from seeking out young, innocent children, grooming them, and then coercing them into producing child pornography for his own pleasure. The defendant has acted like he is above the law. He lied to Dr. Atkins about his conduct, he pushed back against Dr. Gonzalez when confronted about breaking rules, and he continues to justify his "relationship" with the child victim: "We were boyfriend and girlfriend. We would argue from time to time, but we cared

about each other.  I loved her."  Atkins Rpt. at 4.[14]  A significant term of incarceration and supervised release would address these concerns.

Moreover, the defendant is far from the only person inclined to commit serious child exploitation offenses of the sort for which the defendant has pleaded guilty.   The Court's sentence must take into account the compelling need to deter future similar conduct by other like-minded individuals with an interest in child exploitation.   A sentence of at least 60 years would serve this purpose.

### E.    Other Considerations

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ."   § 3553(a)(2)(D).   The defendant does not require drug treatment, nor is there any need to provide him with educational or vocational training.   He had been employed steadily since he graduated from high school, and there is no reason to believe he will have difficulty obtaining employment when he is released from prison.   Any training or education can be accomplished during the long term of supervised release that is required to be imposed for these

---

14 One other factor to mention is the defendant's family's attitude toward his crimes.  According to Dr. Atkins' report, the defendant's 22-year-old sister, Anastasia, made the following comments about the defendant's offense conduct:

> My brother and [the child victim] communicated on the Internet for over a year before they met. When he went to Philadelphia to see her, I sat down and talked to him about it.  I told him that he didn't need to jump into a relationship.  He told me that he never felt at home at home.  He said that he wanted to start his own life with someone, with [the child victim].  He truly cares about her.

Atkins Rpt. at 3-4.  Anastasia's delusional support for her brother's "relationship" is troublesome.  What is perhaps more significant is the fact that the defendant told his sister that he intended to travel to visit with his 14-year-old "girlfriend" and her only caution was about "jump[ing] into a relationship."  This dangerous feedback on the defendant's behavior has likely only contributed to his belief that his conduct was appropriate.

crimes.   This factor should not mitigate the long term of imprisonment that is warranted for the defendant.

      **F.**    **Restitution**

Restitution is mandatory in this case, but the child victim is not seeking restitution.

**V.**    <u>**CONCLUSION**</u>

Therefore, for the foregoing reasons, the government requests that this Court impose a sentence of at least 60 years' imprisonment, followed by lifetime supervised release.

      Respectfully submitted,

      JENNIFER A. WILLIAMS
      Acting United States Attorney


      <u>/s/ Alexandra M. Lastowski</u>
      ALEXANDRA M. LASTOWSKI
      Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date I caused a true and correct copy of the foregoing

Government's Sentencing Memorandum and exhibits to be served by e-mail and the electronic

filing system upon counsel for defendant:

Fortunato Perri
1845 Walnut St., 19th Floor
Philadelphia, PA 19103


/s/ Alexandra M. Lastowski
ALEXANDRA M. LASTOWSKI
Assistant United States Attorney


Date:    October 4, 2021